No. 19-2989

# In The
## United States Court of Appeals
## For the Third Circuit

United States of America,
*Appellee*

v.

# Jeffrey G. Boyd,
*Appellant*

On Appeal from the judgment entered in the United
States District Court for the Middle District of Pennsylvania,
On August 14, 2019, at 4:18-CR-00281 (Brann, J.)

# Brief of Appellant

Heidi R. Freese, Esq.
Federal Public Defender
Middle District of Pennsylvania

Frederick W. Ulrich, Esq.
Asst. Federal Public Defender
Tammy L. Taylor, Esq.
Staff Attorney

100 Chestnut Street, Suite 306
Harrisburg, PA 17101
717-782-2237
*Attorneys for Appellant,*
*Jeffrey G. Boyd*

# Table of Contents

Table of Authorities ................................................................ iii

Introduction .......................................................................... 1

Subject Matter and Appellate Jurisdiction ................................ 3

Issues ................................................................................... 4

Designation of Where the Issues Were Raised and Ruled On ................................ 4

Related Cases and Proceedings ................................................ 6

Concise Statement of the Case ................................................ 7

    a.  Background surrounding issuing the emergency protection order ............... 7

    b.  Mr. Boyd travels to Pennsylvania ................................... 9

    c.  The State Police search for Mr. Boyd, find him, and then take him into custody ........................................................... 10

    d.  The Government prosecutes Mr. Boyd for unlawfully possessing a firearm ........................................................... 12

    e.  Rulings presented for review ...................................... 12

Standard of Review ............................................................... 14

Summary of the Argument ..................................................... 14

Argument

    1.  The district court erred in refusing to instruct the jury on an element of the Section 922(g)(8) offense—that Mr. Boyd "knew" of his status in the class of individuals prohibited from possessing a firearm .................................... 16

2. The admission of other crimes evidence in the form of alleged threats Mr. Boyd made about the President and his family violated Evidentiary Rule 404(b) and was unfairly prejudicial ............................................................ 19

    a. Although the Government offered the other crimes evidence for a non-propensity purpose, it was not relevant to that objective ................................................................................. 20

    b. The prejudicial and inflammatory nature of the alleged threats testimony outweighed its probative value .............................. 23

3. The Government's closing argument, in which it repeatedly characterized the defense as "misleading" the jury, constituted misconduct warranting a mistrial ............................................................................................... 25

4. Section 922(g)(8) is unconstitutional as applied to Mr. Boyd ................... 27

    a. As the district court found, Mr. Boyd's circumstances are distinguishable from those persons historically excluded from Second Amendment protection .................................................... 28

    b. Section 922(g)(8) does not satisfy heightened scrutiny sufficiently to infringe on Mr. Boyd's fundament constitutional rights .......... 31

Conclusion ......................................................................................... 33

Certification of Bar Membership, Identical Text,
Virus Check, and Word Count

Certificate of Service

# Table of Authorities

## Cases

*Association of New Jersey Rifle and Pistol Clubs, Inc. v. Att'y Gen.*,
910 F.3d 106 (3d Cir. 2018) ...............................................................32

*Berger v. United States*,
295 U.S. 78 (1935) ............................................................................27

*Binderup v. Att'y Gen. United States of Am.*,
836 F.3d 336 (3d Cir. 2016) ..................................................... *passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..........................................................................27

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) ..........................................................................32

*Huddleston v. United States*,
485 U.S. 681 (1988). .........................................................................20

*Krulewitch v. United States*,
336 U.S. 440 (1949) ..........................................................................24

*McDonald v. City of Chicago, Ill*,
561 U.S. 742 (2010) ..........................................................................31

*Rehaif v. United States*,
139 S. Ct. 2191 (2019)................................................................ 17, 18

*United States v. Bena*,
664 F.3d 1180 (8th Cir. 2011) ................................................ 28, 29, 32

*United States v. Berrios*,
676 F.3d 118 (3d Cir. 2012) ..............................................................14

*United States v. Caldwell*,
760 F.3d 267 (3d Cir. 2014) ........................................................ 19, 20

*United States v. Emerson*,
270 F.3d 203 (5th Cir. 2001) .............................................................32

*United States v. Evans*,
216 F.3d 80 (D.C. Cir. 2000).............................................................22

*United States v. Fullmer*,
584 F.3d 132 (3d Cir. 2009) ..............................................................14

*United States v. Green*,
  617 F.3d 233 (3d Cir. 2010) ........................................................ 21, 23

*United States v. Gross*,
  961 F.2d 1097 (3d Cir. 1992) ..............................................................27

*United States v. Higdon*,
  638 F.3d 233 (3d Cir. 2011) ................................................................17

*United States v. Himelwright*,
  42 F.3d 777 (3d Cir. 1994) ..................................................................21

*United States v. Huet*,
  665 F.3d 588 (3d Cir. 2012) ................................................................17

*United States v. Lee*,
  359 F.3d 194 (3d Cir. 2004) ................................................................14

*United States v. Mazzarella*,
  614 F.3d 85 (3d Cir. 2010) ..................................................................31

*United States v. McLain*,
  823 F.2d 1457 (11th Cir. 1987) ...........................................................26

*United States v. Morley*,
  199 F.3d 129 (3d Cir. 1999) ................................................................21

*United States v. Pungitore*,
  910 F.2d 1084 (3d Cir. 1990) ..............................................................26

*United States v. Richards*,
  719 F.3d 746 (7th Cir. 2013) ...............................................................24

*United States v. Sallins*,
  993 F.2d 344 (3d Cir. 1993) ................................................................22

*United States v. Smith*,
  725 F.3d 340 (3d Cir. 2013) ........................................................ 14, 23

*United States v. Xavier*,
  2 F.3d 1281 (3d Cir. 1993) ..................................................................18

*United States v. Young*,
  470 U.S. 1 (1985) ................................................................................26

**Statutes**

18 U.S.C. § 3231 ....................................................................................3

18 U.S.C. § 922(g)(8).......................................................................*passim*

18 U.S.C. § 924(a)(2) .................................................................. 16, 17, 18

28 U.S.C. § 1291 ............................................................................3

21 Okl. St. Ann. § 1173 ................................................................30

22 Okl. St. Ann. § 60.1.3 ..............................................................29

22 Okl. St. Ann. § 60.4.C.1 ..........................................................30

22 Okl. St. Ann. § 60.6 ................................................................30

**Rules**

Fed. R. App. P. 3(a) .......................................................................3

Fed. R. Evid. 403 .........................................................................23

Fed. R. Evid. 404(b) ............................................................... *passim*

**Constitutional Provisions**

U.S. Const., amend II................................................................ *passim*

**Other Authorities**

2 McCormick On Evidence § 249, at 104 (4th ed. 1992) ....................22

3d Cir. Model Crim. Jury Ins. 6.18.922G-1 ...............................17

4 W. Blackstone Commentaries on the Laws of England 21 (1769) ...... 17-18

**INTRODUCTION**

Appellant, Jeffrey G. Boyd, owned several firearms and consistent with this ownership, he had a concealed carry permit from the State of Oklahoma and a hunting license. But in March 2018, Mr. Boyd's former wife obtained a temporary, emergency, ex parte order of protection. A final order was not entered until September 2018. Before that, however, Mr. Boyd traveled from Oklahoma to Pennsylvania. He wanted to meet with Kathryn Kelchner, someone with whom he had at times communicated with over Twitter. He erroneously thought she might be in danger. Although Ms. Kelchner suggested meeting Mr. Boyd for lunch, once there, she became concerned about his behavior. This concern prompted her to record some of Mr. Boyd's comments on her cellular telephone, which she later shared with the Pennsylvania State Police.

The police ultimately found Mr. Boyd asleep in the parking lot of a grocery store. There, they interviewed him, and then took him into custody because they were concerned for his mental health. As this took place, Mr. Boyd advised the troopers that he had a firearm in his truck. The troopers confiscated the handgun and ammunition. Back at the State Police barracks, the troopers conducted additional interviews and based on some statements Mr. Boyd had made to Ms. Kelchner about the President, they charged him with having made a terroristic threat. This charge was withdrawn after a federal grand jury indicted Mr. Boyd for

1

possessing a firearm and ammunition while subject to an order of protection in violation of 18 U.S.C. § 922(g)(8).

At trial, Mr. Boyd's defense centered on challenging the loss of his Second Amendment rights by arguing that he did not "know" that he was a prohibited person under Section 922(g) because the order was issued without his having had a chance to participate at a hearing. But three things imperiled this defense. First, the district court allowed the Government to introduce other crimes evidence in the form of alleged threats Mr. Boyd made against President Trump and his family when those statements had nothing to do with this offense or its elements. Then, the court allowed the Government to argue repeatedly in closing that counsel was "misleading" them with his defense that the Government failed to prove an element of the offense—that Mr. Boyd had a chance to participate at a hearing where the emergency order was issued. And finally, the court declined to charge the jury that Mr. Boyd had to "know" of his status in the class of prohibited persons to be convicted under Section 922(g)(8).

These errors denied Mr. Boyd a fair trial.

## SUBJECT MATTER AND APPELLATE JURISDICTION

### A.    Subject Matter Jurisdiction

The District Court had subject matter jurisdiction under Section 3231 of Title 18 of the United States Code, 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States.").

### B.    Appellate Jurisdiction

This appeal was filed under Appellate Procedural Rule 3(a)  , within fourteen days of the order entering judgment in a criminal case.  *See* (App. 1). Thus, this Court has appellate jurisdiction under Section 1291 of Title 28 of the United States Code, 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . .").

# ISSUES

**A.    Issues**

1. To be convicted of a firearm offense under Section 922(g)(8) of Title 18, a defendant must know of his status in the class of prohibited persons based on an order issued after a hearing where he had an opportunity to participate. Appellant argued that he did not know of his status within that class because the disqualifying order was an emergency ex parte one. Did the district court err in refusing to instruct on this element?

2. Evidentiary Rule 404(b) excludes evidence of other crimes unless the proponent establishes a non-propensity purpose. Here, the Government asserted that evidence of Appellant's alleged threat toward the President explained why the police responded. Did the district court err in admitting this evidence when the police testified that they searched for Appellant for a different reason—concern for his mental health, and when the 404(b) evidence had no relevance to an element of the offense?

3. The function of counsel is nearly as important as that of a judge; thus, it is improper for a prosecutor to discredit defense counsel before a jury. Here, the Government repeatedly accused the defense of "misleading" the jury on the central point of Appellant's defense. Did the district court err in failing to grant a mistrial based on this misconduct?

4. The Second Amendment confers an individual right to keep and bear arms. In this case, that right was burdened by the application of the prohibition in Section 922(g)(8) of Title 18 to Appellant based on an emergency protective order issued without the full panoply of constitutional protections. Did the district court thus err in dismissing Appellant's "as applied" constitutional challenge to Section 922(g)(8)?

**B.    Designation of Where the Issues were Raised and Ruled on**

Appellant raised the jury instruction issue in both his proposed instructions and during the charge conference. *See* Appx101-106, 348. The district court declined to charge as Appellant requested. *See* Appx348, 373. Before trial,

Appellant moved to preclude the Government from introducing other crimes evidence, but the district court ruled that it was admissible to "complete the story" over why the police responded. *See* Appx155-161. Appellant objected several times to the Government's closing argument characterizing the defense as misleading. *See* Appx358-361. The district court overruled each objection. *See id*.

Finally, before trial, Mr. Boyd moved to dismiss the indictment, challenging the application of Section 922(g)(8) to him and based on an emergency order of protection as violating his Second Amendment right to keep and bear arms. *See* Appx140. The district court denied this motion, holding that the statute passed intermediate scrutiny as being substantially related to its objective. *See* Appx152.

## RELATED CASES AND PROCEEDINGS

Counsel is unaware of any other case or proceeding that is in any way related, completed, pending before this Court or any other court or agency, state or federal.

## CONCISE STATEMENT OF THE CASE

This appeal arises from Appellant, Jeffrey G. Boyd's, conviction for possessing a firearm when he was subject to an emergency temporary protection order, in violation of 18 U.S.C. § 922(g)(8). The circumstances attending issuing this order—whether the state court issued it following a hearing in which he had a chance to participate and thus "know" he was in the class of prohibited persons, provided the basis for his defense.

### a. Background surrounding issuing the emergency protection order

From 1990 to 2002, Mr. Boyd was married to Jennifer Manley. *See* Appx281. They had a son together, Conner. And after their divorce, Connor resided with Mr. Boyd in Tulsa, Oklahoma. *See* Appx288. But in early March 2018, Connor moved out and began living with Ms. Manley. Mr. Boyd went to Ms. Manley's home looking for Connor, and shortly after this, on March 5, she sought and received a temporary, emergency, ex parte, protective order. *See* Appx234, 281, 539, 544-548. Connor and Ms. Manley's current husband, Eric Hatheway, also sought and received emergency orders. *See* Appx281, 526-534, 554-561. Although the temporary orders prohibited Mr. Boyd from injuring, abusing, harassing, or having any contact with Ms. Manley, Connor, and Mr. Hatheway, there was no evidence that he ever injured or threatened any of them. *See* Appx289, 298.

The Tulsa County Court scheduled a hearing on the emergency orders for March 19, 2018 at 9:00 a.m.  *See* Appx242, 526, 539, 553.  Ten other cases involving emergency orders were also scheduled on that date and time before the same judge.  *See* Appx261.  The docket from the March 19 proceeding reflects that Ms. Manley, Mr. Hatheway, Connor Manley, and Mr. Boyd were present and placed under oath.  *See* Appx246.  There is no transcript from that proceeding.  *See* Appx260.  And there were no witnesses to what precisely occurred.  *Id*.  Instead, Ms. Manley and Connor later testified that Mr. Boyd spoke to the judge.  *See* Appx282, 296.

At the end of the proceeding, the court did not issue a final order of protection.  Rather, the judge continued the temporary emergency ex parte order, with the March 19 order including just one change—Mr. Boyd was ordered to obtain a mental health evaluation.  *Compare* 544-548 *with* 549-552.  The court also set a date for a final hearing in September 2018.

The temporary emergency ex parte orders from March 5 and 19 included language "[t]hat the Defendant has been or *will be* provided the reasonable notice and an opportunity to be heard."  Appx544, 549 (emphasis added).  And those orders stated that possession of a firearm "*may* subject the defendant to prosecution for a violation of federal law."  Appx547, 552 (emphasis added).  By contrast, the final order of protection states that a defendant *had reasonable notice and an*

*opportunity to be heard* or object. *See* Appx254, 264. As important, a final order of protection contains a specific notice of the firearms prohibition under Section 922(g). *See* Appx255.

### b.    Mr. Boyd travels to Pennsylvania

Based on a connection with Kathryn Kelchner through Twitter, in July 2018, Mr. Boyd left Tulsa and drove to Berwick, Pennsylvania to meet her because he thought that she may be in trouble. *See* Appx206-207, 217. Showing up unexpectedly in Ms. Kelchner's driveway, Mr. Boyd introduced himself as Jeff from Tulsa and said he had a story to tell her. *See* Appx207. Ms. Kelchner suggested meeting somewhere, and the next day texted him, choosing a restaurant close to her home. *See* Appx207-208.

While Ms. Kelchner expressed some concern over Mr. Boyd's unanticipated arrival, she also observed that he was "unassuming" and that she had no sense of "imminent danger." Appx209. At the restaurant, however, Mr. Boyd allegedly spoke to her about hearing voices, receiving messages on his computer, and "MK-Ultra."[1] *See* Appx209-210. When Ms. Kelchner mentioned the President because of her conservative Twitter postings, Mr. Boyd allegedly responded with an expletive. *See* Appx210. Later in their conversation, Mr. Kelchner claimed that

---

[1] MK-Ultra was a secret Central Intelligence Agency project that conducted experiments on United States citizens.

Mr. Boyd said that voices in his head were telling him to go to Washington D.C. to kill the President, Donald Trump, Jr., Jared Kushner, and Ivanka.  *See* Appx210.

As a result of the remarks about the President, Ms. Kelchner retrieved her cellular telephone and surreptitiously recorded a portion of Mr. Boyd's statements. *See id.*  After their meeting, Ms. Kelchner went to the State Police barracks, reported her concerns about Mr. Boyd's behavior and played what she had recorded on the cellular telephone.  *See* Appx211.

### c.  The State Police search for Mr. Boyd, find him, and then take him into custody

After interviewing Ms. Kelchner and listening to her recording of Mr. Boyd, two state troopers went to find Mr. Boyd.  *See* Appx216.  Ms. Kelchner texted Mr. Boyd to obtain his location, and he responded that he was at a grocery store parking lot.  *Id.*  With this information, the troopers located Mr. Boyd's truck and approached as if conducting a traffic stop.  *See id.*  They found Mr. Boyd inside and asleep.  *See id.*

After one of the troopers knocked on the truck's window, Mr. Boyd awakened and his two dogs started jumping around.  *See* Appx216-217.  The trooper advised that they were concerned for his welfare and wanted to make sure he was okay.  *See* Appx217.  They then asked Mr. Boyd to step out of his truck, come to the back of it, and talk to them.  *See id.*  In doing so, they asked if Mr.

10

Boyd had any weapons, and he said that he had a gun.  As Mr. Boyd got out, the trooper noticed two loaded magazines in the door's side pocket.  *Id*.

Mr. Boyd was very cooperative, but during the interview, he discussed hearing voices and referenced "MK-Ultra."  *See id*.  These remarks concerned the troopers, who decided to take Mr. Boyd into custody and bring him back to their barracks to talk with someone.  *See id*.  At this point, Mr. Boyd was not under formal arrest, as the troopers were assessing whether the circumstances were a mental health issue or a criminal issue.  *See* Appx60, 62.  During an inventory search of Mr. Boyd's truck, the troopers recovered a .45 caliber Springfield handgun, ammunition, a knife, a concealed firearm carry permit, his hunting and fishing licenses.  *See* Appx219.

Back at the barracks, the State Police discovered that Mr. Boyd was under three emergency protective orders.  *See* Appx231.  The State Police contacted a local assistant district attorney, who advised that they should charge Mr. Boyd with making a terroristic threat.  *See* Appx62, 82, 230.  Besides the district attorney, the state police contacted the Secret Service.  *See* Appx230.  Later, a Secret Service agent interviewed Mr. Boyd.  During the interview, Mr. Boyd did not talk about the alleged threats, but acknowledged hearing voices in his head.  He said, however, that he had never acted on them.  *See* Appx233.

### d.    The Government prosecutes Mr. Boyd for unlawfully possessing a firearm

In August 2018, a grand jury returned a one-count indictment, charging Mr. Boyd with having violated Section 922(g)(8).  *See* Appx28-29.  In particular, the Government alleged that Mr. Boyd was in the class of individuals disqualified from possessing a firearm because he was subject to an emergency order of protection issued for Ms. Manley.  *See* Appx29.

Mr. Boyd raised several pretrial challenges, two of which have relevance here.  First, he argued that Section 922(g)(8) was unconstitutional as applied to him.  *See* Appx140.  In this regard, Mr. Boyd emphasized that his circumstance diverged from that of a criminal, as the disqualifying order was not issued after a full hearing with the required constitutional protections.  *See* Appx146-147.  Second, Mr. Boyd requested that the district court exclude testimony about his alleged threats to the President and his family, as that evidence had no relevance to the firearm possession offense.  *See* Appx49-50.

### e.    Rulings presented for review

On Mr. Boyd's constitutional challenge, the district court found that his circumstance was distinguishable from those who were historically barred from firearm possession.  *See* Appx147.  Thus, the court determined that the Second Amendment protected his personal right to keep and bear arms.  But the court then applied an intermediate scrutiny standard, as opposed to strict scrutiny.  *See*

Appx148-49.  Under this standard, the court held that subjecting Mr. Boyd to

Section 922(g)(8) was substantially related to its objective and thus did not violate

the Second Amendment.  *See* Appx152-153.

As for the motion *in limine*, the court ruled that the Government may

introduce testimony about Mr. Boyd's threats consistent with Rule 404(b) because

that evidence "completed the story" about why the police responded.  *See*

Appx160.  And the court viewed this evidence as probative enough that it

outweighed any prejudicial effect.  *See id.*

At trial, two additional issues arose.  First, the district court refused to

charge the jury that Mr. Boyd had to "know" of his status in the class of

individuals who are prohibited from possessing firearms under Section 922(g)(8).

*See* Appx348.  The court's decision was based on the then existing law that the

"knowing" element in Section 922(g) only extended to the possession of the

firearm.  *See* Appx373.  Second, the prosecutor repeatedly argued during her

closing that the defense was "misleading" the jury by challenging an element of the

offense based on whether Mr. Boyd had an "opportunity to be heard" on the ex

parte protection order.  *See* Appx258, 259, 360, 361, 369.  The court simply

overruled the objections without explanation.  *See id.*

## STANDARD OF REVIEW

This Court exercises plenary review over the legal standard set forth in a jury instruction. *See United States v. Lee*, 359 F.3d 194, 203 (3d Cir. 2004). Likewise, this Court addresses Mr. Boyd's challenge to the admissibility of other crimes evidence by employing plenary review over "whether evidence falls within the scope of Rule 404(b)." *United States v. Smith*, 725 F.3d 340, 344-45 (3d Cir. 2013).

Review of a contemporaneous objection to a closing argument is conducted under an abuse of discretion standard. *See United States v. Berrios*, 676 F.3d 118, 134 (3d Cir. 2012). Finally, on the Second Amendment challenge to Section 922(g)(8), this Court exercises plenary review over a constitutional challenge to the application of a statute. *See United States v. Fullmer*, 584 F.3d 132, 151 (3d Cir. 2009).

## SUMMARY OF ARGUMENT

Mr. Boyd requested that the district court charge the jury on an element of the firearm offense—whether he "knew" of his status in the class of individuals prohibited from possessing a firearm. By refusing to charge the jury on an element of the offense, the district court relieved the Government of its burden of proof and denied Mr. Boyd a fair trial. The district court also denied Mr. Boyd a fair trial when it permitted the Government to introduce other crimes evidence. This

14

evidence was in the form of threats Mr. Boyd allegedly made toward the President and certain of his family members.  It had no relevance to the firearm offense.  And it was highly prejudicial and inflammatory.

Without a jury charge on the central component of his defense, Mr. Boyd was left with arguing that he never had the required "opportunity to participate" in the hearing that led to the emergency protection order.  The Government, however, repeatedly characterized this argument as misleading, even though it was based on the text of the order at issue.  In this context, the Government's closing argument constituted misconduct, warranting a new trial.

Finally, Section 922(g)(8) firearms prohibition is unconstitutional as applied to Mr. Boyd.  He does not fall within the class of individuals who were historically barred from possessing weapons.  And the Government has not established that the provision satisfies the heightened scrutiny needed to infringe on a fundamental constitutional right.

# ARGUMENT

1. **The district court erred in refusing to instruct the jury on an element of the Section 922(g)(8) offense—that Mr. Boyd "knew" of his status in the class of individuals prohibited from possessing a firearm.**

A conviction under Section 922(g) requires that a defendant act "knowingly." 18 U.S.C. § 924(a)(2). And Section 922(g)(8)—the section at issue—has four elements. First, a status element. In Mr. Boyd's case there had to be proof that he was subject to a court order, issued after a hearing for which he had actual notice, at which he had an opportunity to participate, and which, among other things, involved protecting an intimate partner from abuse. *See* 18 U.S.C. § 922(g)(8)(A-C). Second, a possession element. Third, a jurisdictional element— in or affecting interstate or foreign commerce. Finally, a firearm or ammunition element. *See* 18 U.S.C. § 922(g)(8).

At his trial, Mr. Boyd's defense hinged on the argument that he did not "know" that he was in the class of prohibited persons under Section 922(g)(8). Indeed, there were good reasons for not knowing—the order at issue was a temporary, emergency, ex parte one. *See* Appx535. And the circumstances of the March 19 proceeding, coupled with the substantively different language of a final order of protection, supported this view. Based on those facts, Mr. Boyd maintained that he never had the required "opportunity to participate." *See* Appx362. For this reason, Mr. Boyd submitted a jury instruction addressing the

16

element of "knowledge." *See* Appx103-106. But the district court eviscerated Mr. Boyd's defense when it refused that instruction.

To be fair, at the time, the district court's decision adhered to the case law construing Section 922(g). This Court, for example, interpreted the scienter requirement in Section 922(g) as only applying to whether a defendant knew he possessed a firearm. *E.g., United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012); *United States v. Higdon*, 638 F.3d 233, 239-40 (3d Cir. 2011).[2] But shortly after Mr. Boyd's trial, the Supreme Court altered the scope of the scienter requirement in Section 922(g).

In *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the Court explained that there is a presumption that Congress intends that a defendant possess a culpable mental state for "each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 1295.[3] And when, as in Section 924(a), Congress has identified a mental state, that presumption applies with equal or greater force. *See id.* The Court reasoned that requiring that a defendant know the material elements of Section 922(g) dovetails with a basic tenet of criminal law—the importance of showing a "vicious will." *Id.* at 2196 (quoting 4 W. BLACKSTONE COMMENTARIES

---

[2] *Accord* 3d Cir. Model Crim. Jury Ins. 6.18.922G-1.

[3] The Supreme Court granted certiorari in *Rehaif* in January 2019, before Mr. Boyd's trial. So the court and the parties would have been aware of the issue.

ON THE LAWS OF ENGLAND 21 (1769)).  Moreover, requiring a culpable mental state advances a basic criminal law tenet by separating those who understand the wrongfulness of their actions from those who do not.  *Id*.

This tenet has application here.  Possessing a firearm can be an innocent act.  *See id*. at 1297.  Indeed, Mr. Boyd's concealed carry permit and hunting license reflect this.  And as important, possessing a firearm is protected by the Constitution.  *See* U.S. CONST. amend. II.  The Court in *Rehaif* thus held that the word knowingly in Section 924(a) applies both to the defendant's conduct and to his status.  *See id*. at 2194.  To convict Mr. Boyd then, the Government had to prove that he knew he possessed a firearm, and that he knew he had the relevant status when he possessed it.  *See id*.

Here, however, the district court relieved the Government of its burden of proof under Sections 922(g) and 924(a) by refusing to charge the jury on Mr. Boyd's knowledge of his status.  As this element was central to Mr. Boyd's defense, a new trial is warranted.  *E.g., United States v. Xavier*, 2 F.3d 1281, 1287 (3d Cir. 1993) (reasoning that "omission of an essential element of the offense ordinarily constitutes plain error").

2.    **The admission of other crimes evidence in the form of alleged threats Mr. Boyd made about the President and his family violated Evidentiary Rule 404(b) and was unfairly prejudicial.**

The district court allowed the Government to introduce testimony that Mr. Boyd had allegedly threatened to kill the President and certain of his family members. The court viewed Rule 404(b) as a rule of "inclusion," ruling that this evidence was necessary as "helpful background information" to explain why the State Police went in search of Mr. Boyd. Appx160. But the court's reasoning strays from the purpose of Rule 404(b), its plain terms, and the testimony of the troopers. More important, admission of the alleged threat evidence unfairly prejudiced Mr. Boyd's right to a fair trial.

To begin, despite the district court's characterization, Rule 404(b) "is a rule of general exclusion, and carries with it no presumption of admissibility." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014) (internal quotations and citations omitted). Indeed, Rule 404(b)'s objective is to allow a defendant to be tried for what he did not who he is. *Id.* Thus, because other crimes evidence is more prejudicial than probative, Rule 404(b) requires a court to exclude that evidence. *See id.*

Toward this end, Rule 404(b) provides that

> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show on this particular occasion the person acted in accordance with the character.

> **(2) Permitted Uses; Notice in a Criminal Case.** This evidence may be admissible for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or lack of accident.

FED. R. EVID. 404(b)(1-2).  The permitted uses are treated as exceptions to the rule of exclusion.  *See Caldwell*, 760 F.3d at 276.  So the party seeking to admit other-acts evidence has "the burden of demonstrating [the evidence's] applicability." *Id*.  And this burden requires satisfying four distinct steps.  *See Huddleston v. United States*, 485 U.S. 681, 691(1988).  First, the Government must offer the other crimes evidence for a non-propensity purpose.  Second, the evidence must be relevant to the identified non-propensity purpose.  Third, its probative value must substantially outweigh the potential for causing unfair prejudice.  And finally, if requested, the other-acts evidence must come with a limiting instruction.  *See id.*

### a.    Although the Government offered the other crimes evidence for a non-propensity purpose, it was not relevant to that objective.

Here, the evidence of Mr. Boyd's alleged threats toward the President and certain members of his family had no relevance to the elements of the offense.  It did not bear on Mr. Boyd's status as a member of a class of prohibited individuals under Section 922(g).  It did not tend to show that he possessed a firearm.  And it had no relationship to the interstate or foreign commerce element.

Similarly, there was no issue raised over Mr. Boyd's motivation, intent, plan, or knowledge.  He drove to Berwick, Pennsylvania to meet Ms. Kelchner because he mistakenly believed that she was in danger.  *See* Appx206-207, 217. Indeed, the remarks about the President arose in response to something Ms. Kelchner brought up.  *See* Appx210.  In any event, had the Government believed that Mr. Boyd's possession of the firearm related to threatening the President, it would have charged Mr. Boyd under 18 U.S.C. § 924(c).

The district court, however, identified a non-propensity purpose for the other crimes evidence—to show why the troopers searched for Mr. Boyd.  *See* Appx160. In other words, it viewed Mr. Boyd's threats as background information that completed the story.  *E.g., United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010).[4]  Still, to show that the evidence of a prior bad act is relevant and has a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged."  *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994); *United States v. Morley*, 199 F.3d 129, 133 (3d Cir. 1999).  This is where the district court's analysis went agley.

---

[4] While this Court in *Green* held that evidence of a threat to kill an undercover officer was admissible to complete the story, the evidence in that case was tied to the motives of the informant at issue during the trial.  *See id*. at 250.  No similar relevancy exists here.

To begin with, this purpose does not match the troopers' testimony. For example, in the pretrial context, the troopers couched their response as addressing Mr. Boyd's perceived mental health issue. *See* Appx57 (explaining that, "at this point it was definitely a mental health issue"); Appx60, 94 (confirming that Mr. Boyd was taken into custody for a mental health evaluation). At trial, the testimony on the mental health aspect was tempered, but even so, it explained the trooper's actions. *See* Appx217 (stating to Mr. Boyd, "I'm here to check on your welfare . . . to make sure you're okay"). Thus, there was no need for the Government to explain the troopers' response beyond the otherwise prejudicial testimony about Mr. Boyd's mental health.

Apart from the irrelevancy, the threats evidence went well beyond what courts have identified as sufficient for completing the story. For instance, this Court has acknowledged that while background evidence is admissible, it is "an area of widespread abuse." *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993). Indeed, the *Sallins* Court offered that an explanation for the police response or presence may be as simple as "upon information received or words to that effect." *Id.* (quoting 2 MCCORMICK ON EVIDENCE § 249, at 104 (4th ed. 1992)). More important, "[t]he need for background evidence is slight, the likelihood of misuse great." *Id.*; *accord United States v. Evans*, 216 F.3d 80, 87 & n.3 (D.C. Cir. 2000). In Mr. Boyd's case, the Government had an explanation for the police

response—another one was unnecessary.  And even so, presenting the testimony of *two* Secret Service agents to explain why they had to get involved and how they deal with threats against the President went well beyond what was necessary to complete the story. [5]

### b.    The prejudicial and inflammatory nature of the alleged threats testimony outweighed its probative value.

Here, other than stating that the probative value of the alleged threats evidence outweighed its prejudicial effect, the district court provided no further explanation.  *See* Appx160-161.  This was inadequate.  *Cf. United States v. Smith*, 725 F.3d 340, 348 (3d Cir. 2013) (concluding that the district court's truncated balancing under Evidentiary Rule 403 warranted reversal).  First, as merely background evidence, the probative value of the alleged threats was minimal.  As noted, the Government had an explanation for why the troopers responded.  And unlike the circumstances in *Green*, the evidence did not affect an issue arising in trial.  *See Green*, 617 F.3d at 250.

Second, the alleged threats evidence came in repeatedly.  Ms. Kelchner testified at some length to the threats, even interjecting her political views as a "conservative, independent, Republican."  Appx210.  Then Corporal Rasmus testified to the threats, repeating Ms. Kelchner's statements.  *See* Appx215, 216,

---

[5] Their testimony offered nothing on the elements of a 922(g) offense, was unnecessary, and only added another layer to the other crimes evidence.

217.  Next, Trooper Evans touched on the issue, testifying to the President's "impending visit to the area."  Appx225.  After that, the Government called Trooper Paduck, who testified to reaching out to the Secret Service because of the threats.  *See* Appx230.  And Special Agent Kidder testified to his involvement based on threats toward the President, and to how the Secret Service addresses such threats.  *See* Appx232, 234.  Finally, Special Agent Baker discussed the Secret Service's involvement based on a reported threat to the President, and how the Agency addresses threats.  *See* Appx309-310; *see also supra* n.5.

Although the district court issued limiting instructions, *see* Appx 234, 272, they did little to assuage the propensity prejudice.  Limiting instructions mitigate prejudice when the evidence is offered for a permissible purpose.  *See United States v. Richards*, 719 F.3d 746, 766 (7th Cir. 2013).[6]  But here there was little in the way of a permissible purpose.  And the repeated testimony about the threats together with the testimony about the impending visit of the President would have been received as tying the firearm offense to a potential assassination.

For these reasons, the district court erred in admitting the alleged threats, unfairly prejudicing Mr. Boyd.

---

[6] *But see Krulewitch v. United States*, 336 U.S. 440, 453 (1949)(Jackson, J. concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction.") (internal citations omitted).

**3.    The Government's closing argument, in which it repeatedly characterized the defense as "misleading" the jury, constituted misconduct warranting a mistrial.**

Mr. Boyd defended the firearm offense by relying on the plain language of the temporary, emergency, ex parte order of protection.  In particular, that based on that language he was not in the class of prohibited persons.  That is, he had no "opportunity to participate" during the March 19 hearing.  *See* Appx200, 254-255, 362.  In closing, the Government repeatedly characterized this defense as "misleading."  For example, the prosecutor stated:

> And then in this courtroom he has attempted to *mislead* you[.]
>
> \*    \*    \*
>
> He did that.  He tried to do that by – with a *misleading* play on words, like ex parte, with the omission of other words focusing your attention.
>
> \*    \*    \*
>
> Speculation is not evidence.  *Misleading* statements, not evidence.
>
> \*    \*    \*
>
> So what the Government is asking you to do is to tell the defendant with your verdict that you respect the law, that you haven't been fooled, you haven't been *misled*. . .
>
> \*    \*    \*
>
> Maybe then we'll care about those documents on that docket of Mason v. Mason.  But right now it doesn't matter.  It's not relevant.  It's a distraction.  It's an attempt to *mislead* you.

Appx358-360, 369.  But the defense was not misleading at all.  It was

based on the Tulsa County Court records.[7]

When addressing whether misconduct occurred in a closing argument, there

is a two-stage inquiry.  First, were the prosecutor's statements—in context—

constitute misconduct.  *See United States v. Young*, 470 U.S. 1, 11 (1985).  And

second, was the misconduct severe enough to influence the jury's objectivity.  *See*

*id*.

This Court and others have held that a prosecutor should refrain from

attacking the integrity and ethical standards of defense counsel.  *See, e.g., United*

*States v. Pungitore*, 910 F.2d 1084, 1142 (3d Cir. 1990).  Indeed, "the function of

defense counsel is almost as important as that of the judge, . . . and discrediting

counsel before the jury is improper."  *United States v. McLain*, 823 F.2d 1457,

1462 (11th Cir. 1987) (finding plain error where prosecutor repeatedly accused

defense counsel of "intentionally misleading the jurors and witnesses and of lying

in court").  Thus, the remarks here constituted misconduct.

---

[7] A hearing was scheduled on an emergency order.  *See* Appx242, 526, 539, 553.
Ten other cases involving emergency orders were also scheduled on the same date
and time before the same judge.  *See* Appx261.  And the proceeding involving Ms.
Manley and Mr. Boyd was sandwiched in at number seven.  *See* Appx262.  At the
conclusion, the judge continued the temporary emergency ex parte order, and set
the date for the final hearing.

Given the focus of the defense on the text of the March 19 order, the prosecutor's remarks would have affected the jury's objectivity. By comparison, in *United States v. Gross*, 961 F.2d 1097 (3d Cir. 1992), this Court addressed the prejudice from similar remarks. There, however, the prosecutor was referring to the testimony of the defendant and the district court issued curative instructions. *See id*. Here, the remarks referred to defense counsel, as Mr. Boyd did not testify. And the court did not issue a curative instruction. Finally, the statements about misleading the jury were not isolated, but repeated.[8]

The district court, therefore, erred in failing to grant a mistrial.

## 4.    Section 922(g)(8) is unconstitutional as applied to Mr. Boyd

The Second Amendment to the United States Constitution provides, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." "[T]he Second Amendment protects an individual's right to possess a firearm 'unconnected with militia service'" *Binderup v. Att'y Gen. United States of Am*., 836 F.3d 336, 343 (3d Cir. 2016) (en banc) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008)).

---

[8] *See Berger v. United States*, 295 U.S. 78, 88 (1935)(noting that a prosecutor "may strike hard blows" but "is not at liberty to strike foul ones.").

In *Binderup*, this Court set forth a three-step "framework for deciding as-applied challenges to gun regulations." 836 F.3d at 346. First, the challenger must "clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id*. at 347. Once those hurdles are cleared, (3) "the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny." *Id.*

### a. As the district court found, Mr. Boyd's circumstances are distinguishable from those persons historically excluded from Second Amendment protection.

The Government can disarm "unvirtuous" citizens without infringing the Second Amendment because historically such citizens lacked Second Amendment protection. *See Binderup*, 836 F.3d at 348-49. Other courts of appeals have concluded that "[i]nsofar as § 922(g)(8) prohibits possession of firearms by those who are found to represent 'a credible threat to the physical safety of [an] intimate partner or child,' it is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (citations omitted) (reserving judgment on

28

constitutionality of § 922(g)(8) "as applied to a person who is subject to an order
that was entered without evidence of dangerousness").

As the district court found, those historically prohibited from possessing
weapons were "unvirtuous citizens, that is to say any person who has committed a
serious criminal offense, violent or nonviolent."  Appx146 (quoting *Binderup*, 836
F.3d at 348).  And here, the emergency order's prohibition on "the use, attempted
use, or threatened use of physical force," 18 U.S.C. § 922(g)(8)(c)(ii), does not
imply a finding that Mr. Boyd posed a credible threat to another's physical safety.
Ms. Manley's petition alleged harassment, which Oklahoma law provides "shall
include, but not be limited to, harassing or obscene telephone calls . . . and
[conduct placing another in] fear of death or bodily injury."  22 Okl. St. Ann.
§ 60.1.3.  Harassment under Oklahoma law covers conduct that merely "annoys"
another person to the point of causing "substantial emotional distress."  *Id*.  A court
may issue an emergency order on conduct of the defendant not in any way
associated with a credible threat to another's physical safety.

Along similar lines, Oklahoma law does not require the court to find that a
defendant poses a credible threat to another's physical safety before the court
"prohibits the use, attempted use, or threatened use of physical force" by the
defendant. *Cf. Bena*, 664 F.3d at 1185 (rejecting Second Amendment challenge to
18 U.S.C. § 922(g)(8) because in Iowa, the source of the defendant's protective

order, a court may not lawfully issue such an order absent a finding of a threat to the safety of another).  An Oklahoma court need only "reasonably believe" such a prohibition is "necessary to bring about the cessation" of "harassment."  22 Okl. St. Ann. § 60.4.C.1.

Even if Mr. Boyd had been criminally convicted of harassment under Oklahoma law, 21 Okl. St. Ann. § 1173, or criminally convicted of violating the emergency protective order in a manner that "caus[ed] physical injury or physical impairment to the plaintiff or to any other person named in said protective order," 22 Okl. St. Ann. § 60.6, he would be entitled to the protection of the Second Amendment.  "The category of 'unvirtuous citizens' covers any person who has committed a serious criminal offense, violent or nonviolent," but the "serious criminal offense" descriptor applies to only those crimes "punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(g)(1).  *See also Binderup,* 836 F.3d at 351 ("[W]e will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying" the offender from Second Amendment protection).  Neither harassment, nor violating the terms of a protective order and causing physical injury or impairment, are punishable by imprisonment for a term exceeding one year under Oklahoma law.

Finally, as the district court explained, the process attending issuing a protective order is much less involved than a criminal conviction.  Often, a court

issues an initial protective order ex parte, without notice to the subject, and with only the statement of the alleged victim in support, until such time a hearing may be held.  That is the case here.  *See* Appx146.  And those "'unvirtuous' individuals historically barred from possessing firearms were . . . afforded the full panoply of Constitutional protections for an accused[.]" *Id*.

The district court properly found that Mr. Boyd is not, therefore, in the class of persons who were historically precluded from possessing a firearm.  *See* Appx146.

    **b.**    **Section 922(g)(8) does not satisfy heightened scrutiny sufficiently to infringe on Mr. Boyd's fundamental constitutional rights.**

The district court erred, however, in applying an intermediate scrutiny standard.  *See* Appx147-152.  In analyzing Section 922(g)(1) and the Second Amendment, *Binderup* followed *United States v. Mazzarella*, 614 F.3d 85 (3d Cir. 2010), applying intermediate scrutiny.  *See Binderup*, 836 F.3d at 353.  But in noting that the Government "fell short" of meeting its burden "even under intermediate scrutiny," this Court inferred that it need not reach whether strict scrutiny would apply.  *Id.*  There is no doubt, however, that the right to keep and bear arms protected by the Second Amendment is a fundamental right.  *See McDonald v. City of Chicago, Ill,* 561 U.S. 742, 777 (2010).  And strict scrutiny, rather than intermediate scrutiny, is generally applied to laws that regulate

fundamental rights.  *See Federal Election Comm'n v. Wisconsin Right to Life, Inc.,*
551 U.S. 449 (2007).

Indeed, as this Court recently explained, "[t]he applicable level of scrutiny is
dictated by whether the challenged regulation burdens the core Second
Amendment right.  If the core Second Amendment right is burdened, then strict
scrutiny applies; otherwise, intermediate scrutiny applies." *Association of New
Jersey Rifle and Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 117 (3d Cir. 2018).
Therefore strict scrutiny applies.

But even under intermediate scrutiny, the Government must show "a
substantial fit" between the disarmament of Mr. Boyd and its interest in disarming
individuals posing a credible threat to the physical safety of an intimate partner or
child.  *See Binderup*, 836 F.3d at 356.  This the Government cannot do.  Indeed,
Congress never intended Section 922(g)(8) to apply to individuals, such as Mr.
Boyd, whose restraining orders *are not* necessarily based on "evidence credited by
the court reflect[ing] a real threat or danger of injury to the protected party by the
party enjoined." *Bena*, 664 F.3d at 1185 (quoting *United States v. Emerson*, 270
F.3d 203, 262 (5th Cir. 2001) and reserving judgment on the constitutionality of
Section 922(g)(8) "as applied to a person who is subject to an order that was
entered without evidence of dangerousness").  On the other hand, were Section
922(g)(8) intended to apply to an individual such as Mr. Boyd, it would sweep

much too broadly, reaching conduct that would not prohibit firearm possession even were a person criminally convicted of it. The Government cannot reasonably argue that there is a substantial fit between Congress's legitimate legislative interests and the application of Section 922(g)(8) to Mr. Boyd.

This Court should thus find that Section 922(g)(8) is unconstitutional as applied.

## CONCLUSION

For these reasons, the Appellant, Jeffrey G. Boyd, requests that this Honorable Court vacate the judgment based on the unconstitutionality of Section 922(g)(8) as applied. Or, in the alternative, this Court should vacate the judgment and order a new trial.

Respectfully submitted,

HEIDI R. FREESE, ESQ.
Federal Public Defender

*/s/ Frederick W. Ulrich*
FREDERICK W. ULRICH, ESQ.
Asst. Federal Public Defender
TAMMY L. TAYLOR, ESQ.
Staff Attorney

100 Chestnut Street, Suite 306
Harrisburg, PA 17101
717-782-2237
*Attorneys for Appellant,*
*Jeffrey G. Boyd*

Date: March 5, 2020

**CERTIFICATION OF BAR MEMBERSHIP
IDENTICAL TEXT, VIRUS CHECK, AND WORD COUNT**

I, Frederick W. Ulrich, Esquire, of the Federal Public Defender's Office, certify that

1) I am a member in good standing of the bar of this Court;

2) The text of the electronic format of the Brief of Appellant is identical to the hard copy format;

3) A virus check was performed on the Brief of Appellant, using Symantec Endpoint Protection, last update March 5, 2020, and no virus was detected;

4) This Brief of Appellant contains fewer than 13,000 words

I make this combined certification under penalty of perjury under 28 U.S.C. § 1746.

*/s/ Frederick W. Ulrich*
FREDERICK W. ULRICH, ESQ.
Asst. Federal Public Defender

Date:  March 5, 2020

# CERTIFICATE OF SERVICE

I, Frederick W. Ulrich, Esquire, of the Federal Public Defender's Office,

certify that I served on this date a copy of the attached Brief of Appellant by

Electronic Case Filing, and by placing a copy in the United States mail, first class

in Harrisburg, Pennsylvania, addressed to:

MICHELLE L. OLSHEFSKI, ESQUIRE
United States Attorney's Office
235 N. Washington Ave., Ste. 311
Scranton, PA  18503
*michelle.olshefski@usdoj.gov*

*/s/ Frederick W. Ulrich*
FREDERICK W. ULRICH, ESQ.
Asst. Federal Public Defender

Date:  March 5, 2020